Manasco v. Rodgers, et al., and there's an appeal and a cross-appeal for us. Good morning. Good morning. If I were just briefly talking, we haven't conferred this case, but I now address this case to an onion. If we get to the merits, there seems to be layer after layer after layer, but I'm not – maybe we can first address the jurisdictional issue you said you brought around. It seems like what the district court did was to state that there was a factual dispute, therefore summary judgment was inappropriate and denied summary judgment. But on appeal, and I guess below, everybody was saying that for summary judgment purposes, they were agreeing to Mr. Manasco's version of the facts. So why would there be – given that context, if I'm correct, and you've got a really troubled person on your faces, though I'm stating a case that is different from the case that you're familiar with. If that's it, then why shouldn't we send this back to the district court to assume the version of the facts that Mr. Manasco is putting forward and to engage in a saucier or mispronounced analysis against all the defendants? Your Honor, first of all, this is something that the district court can consider, and I think in a qualified immunity context, I think that it's clear that the facts here demonstrate that Miller wasn't entitled to qualified immunity. He makes that statement, what he says is true, that this court in Deaver last year – you know, we rant and we rave and we say, don't cite non-presidential cases to us, the non-presidential because of the non-presidential cases, and I know they get cited and we can't pay enough to cite them. To throw it into a footnote is one thing, but to build an entire argument and rely upon Deavers to solve this case is really not as persuasive as you might like for it to be. Your Honor, I don't mean to throw it out to you, but I think the law has an obvious state of the art, interpretation of the law, and our state court has determined that RAC is not a punishment to the involuntary sexual predator that is part of the regular treatment program, and that if a person who is involuntarily committed, like you just said, when we say RAC makes men incorrect, we at any point could challenge that through the regular process. But if an incident is manufactured or it's not true, in other words an officer misrepresents what actually happened in an incident, in order to get somebody committed into the room RAP, isn't that punishment? Let's go back a second. If Miller made up a story about his altercation with Manasco, made it up entirely, he wasn't threatening, he didn't threaten Miller, there was no physical contact, he just made up a story to a supervisor in order to get Manasco into a room RAP, why isn't that punishment? Well, irrespective of what the courts say, in that context there's no case that has said that. Well, sure he would have known. Why does it have to be clearly established? To make up a story in order to get somebody... Yeah, I would assume that a correctional officer would know that if it is to make up a story, to stick somebody into a therapeutic treatment center where they're not going to get any therapeutic treatment, to stick them in there under the most rigid conditions of confinement, just to jam them up to something that they may have said to you and they didn't even say it, you made that up because you wanted even a score or something. You're saying that a corrections officer might have known that that is problematic, that you can't just put somebody in that kind of a situation for no reason at all except for your own vindictiveness. I think that there's a version of facts that Manasco presents and that his experts accepted that demonstrates that that was not the fact. Well, wait a minute. Miller says to accept Manasco's version of the facts. And we are accepting his version of the facts. Manasco testified that he was standing in a hallway in between a wing and a gate room holding a broom and that some other resident named Wick found running through the other end of the screen and causing a commotion. A sergeant then comes chasing after Wick and then Miller comes chasing after the sergeant chasing after Wick. In view of all of that chaos and what Officer Miller described as a disaster situation... Well, that's Miller. And I stick to what Manasco said, not what Miller said. Because the fact that Miller said it was a disaster situation does not mean it's a disaster situation. But, of course, Miller thought that that was a threat and accused Manasco of threatening him. But back up again. Now you're relying upon Miller's report to establish what happened. And we can't do that. We have to rely upon what Manasco said. And part of what Manasco said is that Miller chomped up his report to stick him into WRAP. And the initial placement into WRAP is... It envisions or assumes what would happen after the initial placement. How long would there be a review of the placement? When did that first take place? When did Manasco for the first time have an opportunity to stay inside of the incident? I don't know. But it didn't happen as long as thought. He had an opportunity when he had the discourse about the rules and programs for day-third-by-day. And he also had an opportunity that he wanted to take advantage of, which the State of California has said he has not had the opportunity to assess court and the statute to challenge a recent decision at any time. Let me ask you a question, if I might, Ms. Wood. Your assertion is, and I'm looking at Supplemental Appendix 15, which is the WRAP policy, Procedure 1B, the program coordinator shall review all incidents on his or her assigned unit within 24 hours or in the case of weekends or holidays the first week following the incident. Your assertion is that Mr. Campoli going by and talking with Mr. Manasco constitutes a review of the incidents as contemplated in the policy. Is that right? Yes. Okay. And is that, in fact, the way the policy is typically carried out, that there's a drop-by and visit and then that's the review of the incident? You know, I think it depends on the situation. Here you also have the fact that Manasco was at the evaluation by the New York State Attorney. Twenty-five minutes later, he had a seizure. Try to pull the mic a little closer to your friend in front of you. Okay. So 28 to 25 minutes after he got to the room, he had a seizure. So there was a different situation here where you have somebody I'm just trying to find out as a matter of fact whether that is whether what happened here was consistent with the way the program coordinator reviews incidents. I think that as an initial matter, yes. They stop by, they say, you know, what happened, what's going on, are you okay, or, you know, all right. So, you know, calm down, you know, think about things. And reviewing it, going in, checking on him, making sure he looks at it. You referred to the placement in the wrap as a treatment decision, and that's why we're here. Mr. Manasco was saying it wasn't a treatment decision. If it were a treatment decision, it seems to me, I'm not sure it would be totally clear, but you'd be on a lot firmer footing, and the cases you're relying upon would really fall into the neatly to support your argument. But we're here under the assumption that the placement was not a treatment decision at all, but an act of inactiveness on the part of Miller. And I'm wondering why the cases you're relying upon, even deeper to the extent that it might be persuasive, help you in that regard. Well, I think that because the law wasn't, at the time of the incident, allowed him to challenge it. And what the law says is that if there is a false report, a false charge, the law is given, then that was not a constitutional violation. And what I'm saying here is that the law, at the time, in 2001, allowed Mr. Manasco to challenge it. But he's saying he wasn't seeing this initial stop, buy, or drop in, and that apparently coincides with the seizure. He's then saying he wasn't seen for, I guess, four days. There's some interlude, and I don't know if this was the first day or toward the end, where Lieutenant Gonzales, I guess we thought it was Gonzales didn't come in. Another person came in and said, you're getting nothing. And there's some issue about what is meant by that. Is that a statement which simply states the nature of the confinement and the room wrap, or is it basically telling him, you're not getting a change of clothes despite the fact you've But you're stating, as though it's fact and established, that there is a way, a meaningful way, that he could have challenged his confinement to wrap. He is saying there's no way to challenge it, and the whole thrust of his argument is denied after the process because of that, because there's no way to challenge it at all. He's locked in there. Nobody comes in to see him. Somebody comes by and sees him having the seizure with the glass closed, another inmate, who can't come to his assistance, but yells out, this guy's having a seizure, and nothing happens. How would he get into those situations? What mechanism was there for him to raise an objection formally to have his treatment reviewed? I know what the statute provides. In reality, what could he have done? Regardless of the ability to challenge his confinement, why can't we focus on that initial decision? Supposing we accept Manasco's version of the facts and agree with the district judge that he was put in there for punitive reasons, or that at least it's a factual dispute that should be resolved by a jury. And, of course, if we do conclude that he was put in there for punitive reasons, he would have an actionable 1983 action, wouldn't he? Well, under Youngberg, why wouldn't he have an actionable 1983 action? If he could establish that the only reason he was put in a room wrap was for pure vindictiveness, to punish him, to get even, the subtlest score, so that he knew who was boss, who was calling the shots, however you want to phrase it. Nothing other than that. You're saying there's no 1983 action? That's a normal condition of confinement under Sandlin? The only facts we have are his allegations. The allegations he's making are the only facts we have at this point. So the district judge said there's a factual dispute as to his initial confinement in the room... I forgot the acronym. Wrap. Not wrap. Okay. He's from Jersey. For a second. The experts didn't talk about Midasco's motivation, Miller's motivation in putting Midasco in the room. They talked about a lot of other things, but they didn't talk about that. I'm sorry. No, but his account, but it was his account of what occurred on the floor that served as a basis for his being confined. And supposing that he fabricated... It's just supposing, because we're just taking Midasco's version for purposes of summary judgment. Supposing he fabricated the entire account. And that resulted in Midasco being confined. Why doesn't that set out a basis for 1983 action, assuming that he can prove damages and so forth? It's not just a false report in and of itself. The question that you're being asked by Judge Fuentes isn't just words on paper. It's words on paper which result in, which according to this hypothetical, Officer Miller knew would result in Mr. Midasco being placed in room wrap, essentially solitary confinement. So that's the question, and why wouldn't that be a 1983 violation? I lie knowing it's going to put you in solitary. That's the question. Now you're out to standing versus... You can go ahead and respond. Your opponent in the reply brief says, wait, the position that Ms. Wood would have you take actually puts people who are civilly confined in a worse position than even convicted, than pretrial detainees. Why don't you respond to that? What's the logic that would have us say a pretrial detainee is in a better position than somebody who's not in jail, even under a criminal charge? I think that... I haven't asked my question clearly, I don't think. Here's what I take to be the logic of their argument and what I'd like you to respond to. They say Sandin is a criminal case, and it tells you, and the line of cases associated with it tell you that segregating somebody from the general population is not going to be a problem unless it's an atypical and significant hardship. That's in a criminal context, and that's something that applies to convicted criminals. But pretrial detainees have better rights than that, and the law tells you that a pretrial detainee, somebody charged but not convicted, has better rights than that. And Judge, this is now speaking in the voice of Mr. Manasco, not as well as the lawyers have done, Judge, that's not something you can apply to civil detainees because it ends up leaving them worse off than a pretrial detainee in a criminal case. That's their logic, if I've tried to do it justice. How are they wrong? Why should, if their logic is right, Mr. Manasco would be better off charged criminally and awaiting trial than he is in a supposedly therapeutic environment. How can that be the law? Well, I don't know, I don't think that that's the law. I think that, considering it's wrong to consider wrath as punishment, it's wrong to consider his confinement as something different. He testified that the room that he was in was exactly the same as his regular room. But he couldn't get out. Well, and there are a lot of times when he can't get out. There are a lot of conditions that are much more significant. That's not exactly accurate, though. The room was maybe structurally the same, but it wasn't equipped the same. His regular room was equipped for someone who had seizures. He had bars on his bed, and I think there was other protection. But the room that he was in in Iraq was not his regular room. I don't want to distract you from Judge Jordan's question, by the way. Yeah, going to that again. So your answer is it's therapy. That's your distinction. That room wrap is therapy, and therefore you don't have to worry about the fact that he's in effectively solitary lockdown. It's therapy, and therefore the concerns expressed in the case law regarding prisoners have no application. Does that follow you? Well, what makes it therapy? Is it therapy because it's set up under a program intended to give people therapy? Or is it therapy because actually the person gets therapy while they're in this? It's therapy in the sense that there's a program within a prison that would otherwise be a prison, but in terms of these inmates, it's like the 980 inmates in some of the cases you're arguing. As to these inmates, it's not a prison per se, but it's a method of confining people to get therapy. It's mandated by law. But if they're there and detained under pretty oppressive situations, not with the intent of giving them therapy, but simply to stick it to them in the vernacular, how does that make it therapy? You were getting away. This is not a timeout, Mrs. Cook. I'm sorry. He wasn't given a timeout. He was put in basically what we used to call solitary confinement or isolated, whatever the terms are now that are used by the professionals. He's put in a room by himself with a phone. I guess he gets visitors. But he's basically in lockdown, as Judge Shorten said. And he's put there. In your answer, you're suggesting he was put there, forecast some quiet, contemplative time to cool out until he could get better control of himself. But that assumes the veracity of Miller's account. If we assume the veracity of Menasca's account, he was put there basically because of vindictiveness, because Miller got ticked off at him. That's got nothing to do with therapy. We keep coming back to that. We can't assume that he was put there because he threatened Miller. We're assuming that he did not threaten Miller, that Miller threatened Menasca, and that Miller's way of getting back at Menasca or exercising control because of a verbal altercation was to stick him in the boomerang without any therapeutic purpose whatsoever. And I understand Miller didn't put him in there, but Miller knew enough to write out a report that was going to get him in there. And while he was in there, he did not have access to the kind of treatment or therapy that was seen on the face of it, would be the very purpose of the therapeutic program that you're describing, that BAP is supposed to be. But he didn't get any of that. According to him, he had at least a couple of seizures. He urinated on himself, was not given a clean change of clothing. And you're saying, well, that's therapy. I guess maybe you can call it self-love, but I have trouble seeing how that's therapeutic. That's true. That's true. Well, I'm not sure about that. Okay. Well, we'll look at the record on that. He clearly did say that he did not tell, at least one time, he did not tell anyone that he urinated on himself, and clearly that's on him, though pun intended. But I thought there were also allegations that he, in fact, urinated on himself, and no one came to check on him to see that, because this was after the initial stop by the nurse. He was kind of left there. No one checked on him. And even more importantly, there was no preliminary decision made to determine whether or not it was appropriate to put him into what you're representing as a therapeutic treatment room. The initial decision was to separate him from the environment and that the regulation makes clear and it amplifies the reality. When your external control has disintegrated, shouldn't it be said that you act in a way that is... We're back to assuming... Supposing we disagree with you completely, and our conclusion is not that he was put in confinement for therapeutic reasons, he was put in confinement simply to punish him. Supposing we come to that conclusion on the basis of the record before us, is that a constitutional violation? Wait a minute. Let's go back. Regardless of the reason, whether he was disruptive or not, he was put in confinement for punitive reasons.  Okay. I'm sorry. You kind of... It's true. You cannot punish a civil committee, but you cannot punish him if he wasn't in fact punished. But you can, without calling it punishment, you can't separate a civil committee from... I understand that. I think it's... You can segregate somebody who appears to be violent and might be a danger to himself or others. I understand that. I'm not sure that's the case here, but I understand. You can do that just based on security reasons, because these officials have to be able to control what every court does with these cases, having tried to have a volatile environment. It's not the same as a traditional psychiatric hospital, a general civil committee, where they have their more... They're suffering from different types of illnesses, but not with personality disorders or antisocial or sexual offenses. Every court has said that the only... They're generally... These people are high-functioning, except for their inability to control their sexual behavior, even though it's a personality disorder. So it's an application of the younger... I'm not sure how that helps you. It seems to me that it hurts you. These are highly-functioning people, except that they have a personality disorder, which leads them to become sexual abusers. And based upon that isolated, relatively easy-to-define, at least in theory, problem, you can then subject them to any kind of confinement in quality treatment. That's kind of what you're arguing. Any kind of deprivation. The program that he was subjected to was part of the treatment program. It was a regular part... Well, how does the RAP that he received fit within his treatment program? My understanding of the RAP program was that in order to get out of that, part of what you have to do is try to internalize your own conduct, face up to your own conduct, have discussions with why your conduct put you into RAP, and realize responsibility for your conduct that got you into that confined situation. That's the whole theory, as I understand it, behind these four levels of deprivation. But if that's the theory, it only works if you're in there under conditions which would allow for that kind of treatment. It would not work if you're only in there because you didn't do anything wrong, except maybe yell at a CO who then put you in there out of pure vindictiveness. And that's not treatment anymore. That's the thing that he had said, that the NAFTA had the right to criticize or yell at the office, the attorney officer there, and the NAFTA said, but then you don't think it's going to happen. He took off. He said that it was wrong. He said, in fact, throughout the court, he talked about it a couple of times, but he said that ultimately, if he's utilizing, he's going to handle things in a different way. And that was the whole purpose of it, to say, all right, you can handle things differently. So that was the purpose of the time out in the RAP confinement. So what Miller did was say to himself, Mr. Manasco is being inappropriate in his behavior and the way he's conducting himself. In order to get a better, in order to help Mr. Miller get a better handle on himself and get more in touch with himself, I'm going to fill out this report and put him into room RAP so that he will have the time to contemplate things and discuss with others and himself the behavior that has led to this deprivation of privileges. That was kind of what Mr. Manasco's thought process was like. And therefore, there was handling violation. That's what he's saying. That would be assuming the believability of Miller's report. In other words, his own expert said that that was appropriate response to the incident. Manasco said that he got in Miller's face. Manasco was criticized him for that treatment of another resident. That's Manasco's testimony. Those are the facts that everybody has to deal with. And those are the facts that Manasco's own expert said required the commission to place him in RAP. That expert, our president, the no-brainer for both Miller's law and war, both testified that in that interaction, that response by Manasco, it was absolutely appropriate for his initial placement in RAP. And once he was there, so those are the facts that... Okay, but tell us what you were going to say. Once he was there, what? Once he was there, if he felt that he wanted to test it, he had that opportunity to test it at any time. It can happen using the phone, which he had the right to do, use the phone, have a visitor, have a lawyer come in, use the phone, call the lawyer and say, I feel like I was wrongfully placed there. And what he wanted when he testified there was that he had to be vindicated that the event didn't happen. So don't ask for a statement that it happened. He could have applied to the FTC judges and gotten a hearing. His last hearing has been, the only limitation is, it has to be 48 and a half years later. His last hearing was December 18th. His absence just occurred February 1st. So he was within that time, he was beyond those 48 days of his last hearing, but he made that application to the court and said, I want to be vindicated. I want him to find that this didn't happen and I shouldn't be here, I should not be here. And he never did. Okay, did you guys have time for a button? I can't remember now. I forgot to tell David to say it. Well, as long as you told Mr. McCullough, that's fine. Okay, thank you. Morning, how do you pronounce your first name? Is it Avedon? Avedon. Okay. Okay. Well, let's get to the facts and specifically to the assertion by Ms. Wood that Mr. Manasco's experts acknowledge that based on his version of the facts, his commitment to RAP in the first instance was appropriate. Do you agree with that statement about the record? I do not, Your Honor. Okay, then explain why she's wrong when she says it. Well, the accurate analysis of amenity has been a disciplinary purpose due to the placement of Mr. Manasco in RAP. Once he was placed there, he was treated in a solely accounted way. The nature of – Just asking about the placement. So you're not disagreeing that the initial placement was something that the experts agree, even under Mr. Manasco's version of the facts, was appropriate. That is, the initial, putting him in RAP. After that, we can talk about it. Up to that point, he's in RAP. Do you agree that that's something that everybody agrees under Manasco's version was right? No, I do not, Your Honor. Then explain why that's wrong. Ms. Wood's characterization of Mr. Manasco acknowledges that he was not reported by the test site in the deposition test. They quoted the deposition test when I read it, and I thought I understood Mr. Manasco to acknowledge that he said he swore at and told Mr. Officer Miller something to the effect of, get your effing finger out of my face or something like that, and it was on that basis, sworn testimony by your client, that the experts he hired or you hired for him said going into RAP in the first instance, that was the right thing. Is that a correct statement of the record or not? The initial placement may have been correct. That's what I'm asking. I'm just asking about the initial placement. So we're past that initial placement. People agreed that was okay. So what happens after that is the problem? That is correct. Okay. Now, why don't you explain to us what happens after that gives rise to a constitutional violation. As was discussed with Ms. Woods, as a civil committee, Mr. Manasco was right not to be punished. He is. And as you make that quite clear, that's respectful of his violence and pain. Why not be punished? So a number of people may have answered the proposition that an individual, civilly committed, entitled to conditions of confinement, conditions of treatment that are superior to that for which he's prisoned. And that, in fact, punishment cannot be meted out against a civilian. It's not exactly what it's trying to get at. Okay. Now, let's talk for just a second about the, well, about the policy and then I'll see you in a minute. First, I read some of your briefing to say that there is no policy in this regard, that is, with respect to the review and the procedures associated with somebody in NMRAP. And maybe I misread it. But I've got and have looked at the Northern Regional Unit Policy and Procedure, which is stated effective 8-12-99 and is in the appendix beginning at S.A. 15. And it appears there is a policy. It may be one that Mr. Manasco doesn't think is adequate or that he doesn't like, but there's a policy. Did I misunderstand your briefing? Apparently. A policymaker's. Well, there are two definitions of that. There is certainly a draft policy that requires that there be notice, an opportunity to respond, an investigation is done to the allegation. But we contend that none of that policy, and that is indeed without a doubt a draft policy, is what's possible. In respect to the policymaker's, in respect to denial of aspect, that we contend that there was no policy of assessment of an individual subject, are all going to have to be able to withstand isolation. Is there a requirement for such a policy? Is there a requirement for such a policy? Well, yes, there is. There is not necessarily a specific policy. And I don't think that as qualified community case, there needs to be such a rigid block on whether or not that specific policy. But how can they violate? How can they violate their rights if there is no specific policy that dealt with medical treatment or therapeutic treatment? Well, this is an act of contention. Certainly, a number of your medical experts in this court in 2003 made clear that there is an entitlement to adequate medical care. And that by failing to create such a policy. But you're saying that the failure to provide any policy regarding medical care and treatment, forgetting the procedural part for a second, the failure to have any policy in place as to what would happen to him once he got in there, substantively, is a violation of the order. That's correct. What about what she's arguing with the procedural part of it? She's saying that once he was in there, he could access the phone and that's not disputed. He could have picked up the phone, called the judge, and I'm sure that's not the kind of procedural due process the institution has in mind where you call the judge and, if you will, dime out the institution to get your case heard. But isn't that some kind of adequate process that is afforded to him procedurally once he's in the WRAP environment? Your Honor, there's something in the record that indicates they afforded him that opportunity to do so. Indeed, what Mr. Manasseh was content that upon handcuffing him, doing the surgery, and bringing him to isolated confinement, she never explained the fine factors that took place there. And, indeed, there is an assignment form filled out by Captain Hathaway which she never filled out the portion where it said that notice was provided that he was in violation of the WRAP policy. He was held there, never given an explanation. He could have picked up the phone and called. That's what she's saying. That's what Ms. Wood is saying. He could have picked up the phone, called his lawyer, called the judge. The judge may not have taken the call. Probably wouldn't have taken the call. But at least in theory, there's some avenue for some kind of hearing, at least a way to get word out to challenge his confinement. That's what she's arguing. Well, Mr. Manasseh was a man addled by theory. And, indeed, as the record evidences, you have to see it was in minutes of being placed in isolation. It was an individual who was terrorized. And then later urinated on himself. And, indeed, there may have been more, because there was no adequate monitoring process. But the monitoring goes back to the substance of the part again. I understand what you're saying, that once you put him in there, the absence of any policy for treatment or medical care or monitoring gives rise to a substance abuse process, liberty violation. But in terms of the procedural part of that, and it seems to me that's more troubling. You may well be right on that. If we get to it, I don't know. That's the procedural part of it. Again, Ms. Wood is saying the procedure is there. You're saying to the extent that the procedure requires notice. Notice wasn't given because that part of the form was left blank. So he's put in there without knowing why he's in there. And I guess, using Ms. Wood's own argument, that if you're in there without knowing why you're there, how can that be part of the contemplative treatment process that this program was designed to set up? But if all that is true, does that get you to the level of a Sandin deprivation? Well, I really think that the Sandin should not apply. But this is back to your question.  Under Youngberg, I think, absolutely, Your Honor. I think there's clearly a substantial departure from the standards of professional judgment. And if one looks at the testimony of other plaintiff's experts, they make it quite clear that there was significant departure from the standards of professional judgment. If we're talking about the policymakers, why are we talking about professional judgment instead of deliberate indifference? Well, to put it, Your Honor, I think professional judgment standards is indeed the official standard in the civil commitment context involving professional subjects. Such as Mr. Rogers, Mr. Campoli, and Mr. Ferguson. Forgive me. Charlie Jack has applied that standard. And indeed, when you're dealing with professional caregivers, that should be applied. How did they fail to exercise correct professional judgment? With respect to Stanley, the policymaker's claim is with respect to Stanley to institute an assessment policy with respect to Mr. Nassau. Do you need a policy if they nonetheless did that? In other words, if they assessed him? You're saying they need a policy, meaning a written policy, that this is what we'll do in all circumstances like this. But what if they did that? What if they nonetheless exercised professional judgment and assessed his needs and his needs were addressed? I think Ms. Wood would suggest that you couldn't really do a full-blown assessment under the circumstances because the professionals were faced with an emergent situation. So they had to make an immediate decision. And that's what they did. They segregated him by putting him in confinement. What's wrong with that? How did Judge Hofford come to the conclusion that the only thing in play was a procedural due process question? Did she end up saying in one of her opinions that what was at issue was a procedural due process claim, not substantive due process? Right. It wasn't substantive due process. Why shouldn't we send this back to the district court for a saucier analysis, given the disputed fact that exists? She assumed... She says there's a disputed fact and, therefore, some of the judgment is not appropriate. In other words, we've got an assumption that we're going to proceed given Mr. Manasco's viewpoint. But why shouldn't we send it back and allow her to do the merits analysis in the first place? Your Honor, I mean, that isn't part of what we asked for. The only difficulty has been that Judge Hofford has at each opportunity, when facing a disputed fact, seemed to have resolved that thing correctly in favor of the defendant. But we certainly ask that the case be retransmitted in response to the result of that. Rather than taking it ourselves as a matter of law, as Ms. Wood is asking and trying to make the determination here. But some of these legal issues need to be addressed because they were not... Which issues? Would we have jurisdiction to do that? I don't know the answer to this. But if the district court erred in her treatment of Miller and then certified the other three, would we have... If we don't have jurisdiction over Miller's claim, do we have jurisdiction over the other three? Because the first part of the Saussure will determine whether or not there's been a constitutional deprivation. And if there hasn't been, then we don't have to get into the qualified immunity analysis. But why shouldn't we look at this in terms of we don't have jurisdiction over Miller because there are disputes of facts. Therefore, we don't have jurisdiction over any of those cases. Did I ask that? I may not have asked that. I was thinking it clearly. I may not have asked it very clearly. I think you did, Your Honor. Okay, I thought the clerk sent one out. You may be right. I just want to pause. You may be right. Okay. Let me dig a little bit further on what the district court did because there's clearly some daylight between the parties and the district court judge about what was going on in the case and what the record was. One of the things Judge Hochberg said, and I believe I'm right about this, is that there was no objection to the qualified immunity claim by the policymakers. Can you enlighten us on how she could have been confused about whether or not you were opposing that? Do you have any insight on that? Yes, Your Honor. I mean, we certainly dispute that and believe that we did. And, indeed, it's a farm to mention that a qualified immunity would be both in defying the motions of summary judgment or replying to anything our policymakers said. Okay. I'm just asking. I should be more precise. Okay, tell me where in the record you said, hey, we are objecting to that. In other words, I need a record cite so that when I look at this, I'm able to say she was just wrong, she missed it in the record. Or I need to know that, in fact, you didn't object and she was right. Well, I would contend, Your Honor, that simply in conflict of qualified immunity claims, we did indeed assert throughout that constitutional violation has been perpetrated. And once we make that claim, we can attempt to avert it. So you can't help me understand how the district court could have come up with this statement. Quote, the three policymakers' assertions that they are entitled to summary judgment based on qualified immunity are unopposed. Footnote, the court commends the wisdom of the plaintiff's decision not to oppose qualified immunity to the individual policymaker defendants. Ellipse period. That's page 13. So when did you stop beating your wife? I've got no question. You're being asked to preserve your claim and say I'm a trial lawyer? We believe so, Your Honor. We believe that in the pre-trial order as long as it's paragraph 40, 41, 44, 47, in that pre-trial order, there aren't any policymakers that can preserve it. Okay. Now, Sanden, and I apologize, I didn't want to go on to the next question. You dilate on that at some length in your reply brief, and I'm wondering if that, as I was reading that, I was left to ask, does the very fact that this is being argued at some length indicate that it's not something that one could say made the constitutional right that's being argued about clearly established? I mean, that's a little bit of an... I don't know whether I'm making myself clear or not, but if it were so clearly established that Sanden didn't apply, if it was so clearly established that what was going on here was wrong, would you need to argue at length that Sanden doesn't apply? Do you understand what I'm trying to get at? I do, Your Honor. I think we can put forward three arguments to the effect of Sanden, one of which is that Sanden does not apply but the other two arguments did indeed say even if we take Sanden, even if that is the governing standard, then indeed Mr. Manasso should still prevail because of the hardship, because of the significance of the hardship that was placed upon Mr. Manasso under this place in the room right now. Would the hardship there be placement for an improper motive? It wouldn't be the fact of the placement itself, would it? It would be the motivation behind the placement and being placed there without the treatment that you're arguing he was entitled to. Where in there does the violation occur? Is it all of the above? I think it can be both, Your Honor. In terms of being subjected to false charges for being placed in a segregated confinement, really any source, without the people to process, without any people's perception, would be a violation of the people to process. But here we have a situation where the nature of this confinement was reprehensible, Your Honor. It was placed there for four days in isolation where he was left to yearn and toil for self-development. He was not provided any treatment. But Ms. Wood is right. There was at least one time where he did not tell, no, clearly four days in judicial notice. He only did it more than once in four days, assuming his kidneys were working properly. But there is some issue about whether or not the people in authority knew about the condition he was being housed under. And there was your argument that they had an obligation to at least check on the guy and see what his condition was without being charged. Your Honor, indeed they did know, or certainly should have known. Indeed, the testimony of Grace Rogers, the administrator of the Special Treatment Unit, that Mr. Manaska's seizure condition was wrong. He was certainly aware of that. And that urination problem is a condition that goes concomitant with the seizures? Is that correct? That is correct, Your Honor. And Mr. Campogne and Mr. Ferguson, the individuals who administered the Special Treatment Unit program, and the people whose ultra-astrophysiology, the special of astrophysiology, should certainly have been aware and had an assessment of his condition. They received determination reports from Mr. Manaska once he was removed from prison, which spoke of his validity of ailments that he suffered from, including suicidal tendencies, a tendency to deconcentrate under stress, anxiety disorder, and of course the seizures that we discussed. With that sort of information being provided in the official documents, they did indeed have an assessment of his condition and should have provided the items that Mr. Campogne recognized as valid. Isn't the policy, the WRAP policy that's in place, and I understand the distinction, I think I do, that you're making, saying, yeah, there was a WRAP policy, but there wasn't a separate policy about treatment. But doesn't the WRAP policy itself talk about alternative programming that the treatment staff can set up and things like that that can be done? In other words, isn't what you're asking, what you're saying doesn't exist in some form, even though it's vague and not delineated with the degree of specificity you might like, in the WRAP policy, it talks, I'll give you an example, it talks about somebody in room WRAP  and phone calls, et cetera, et cetera, and then it says, among other things, the resident shall be afforded alternative programming arranged by the treatment staff. Does that imply that treatment is going to be going on, they're going to be looking at treatment and taking care of somebody in room WRAP, that there is a policy there or not? Oh, no, I think the WRAP policy, by a certain degree, in the case of therapeutic objectives, requires an evidence-by in this example, because it's not about anything therapeutic going on whatsoever. And again, the expert testimony evidences that, finding, despite the language of the WRAP policy, it was not carried out from them. And indeed, the alternative programming mission was never about alternative programming. So the assertion here isn't so much that there was no policy, is that the policy that there was was not applied properly. Is that it? Again, I apologize. I may not be clear. With respect to the policy makers, we do contend that there was not an assessment policy. That's what I'm asking about. Maybe I wasn't clear enough. I know I understood you to be contending that, and that's why I'm asking the question. When you say there's no policy, explain to me why this policy, which includes statements about treatment and programming, is not a policy. You say there's none. I'm reading this. There seems to be something there. Maybe help me out. Right. Our contention is that prior to being put in WRAP, an individual such as Mr. Nasso, as Mr. Nasso, should have received an assessment to determine how to withstand isolation, to determine how, indeed, can we react, how would an individual with a seizure disorder decompensate under stress, react, and more than the record indicates, regrettably, tragically, he reacted in the most horrible way, having seizures, injuring his head, and boiling his urinary tract. Is the problem the absence of a policy or the failure to follow when it's in place? Two components, John. It was both a failure to have that assessment policy, and then, in addition, there was a monitoring policy that was not followed by the detention unit, and that policy was required to be checked on, as Dr. Lowenthal suggests, at least every 15 minutes, and that none of that was done. Indeed, the testimony indicates that individuals were not trained on the WRAP policy by Mr. Ferguson, who was in charge of that policy, and as Dr. Clark says, he didn't know what to do. He didn't know how to handle it. Did the district court address any of those issues? Did the district court apply a policymaker, did address a policymaker claim, but improperly used to deliver a different standard instead of a professional standard? I don't know the answer to this, but it seems to me, under city of Sacramento, there's a potential when all this comes from it, and we get into a situation where we assume necessarily that liberty and indifference is separate from professional judgment, but I think we would all agree, and I think Ms. Woody would agree. I'm not saying that this case, that you can have a case where the expressional judgment was so lacking that it shocked the conscience, and I'm wondering, maybe the confusion is more in the language used, and the opinions, and the facts, and towards the cases arise. And an actual difference in standard. If it's just professional judgment, I think it would be something more than professional judgment, because then you're talking malpractice, and I think we'd all agree that you've got to have something more than malpractice to get a constitutional claim. And maybe we wouldn't agree where you're talking about somebody who's civilly committed, but I think it's the first statement. Even with civil commitment, you've got to have something more than medical malpractice, and I think Youngberg would say that as well. The extent to which the deprivation of judgment over the violation of professional medical standards rises to something which shocks the conscience, I guess is what we would be arguing about, and I'm not sure there's a difference. I just don't know. Or maybe one could argue that in certain contexts, not exercising professional judgment wouldn't in itself shock the conscience. It seems to me that goes too far. And you cite Lucerne and rely on it, right? We rely on it, Your Honor, for the contention that there shouldn't be a default, that there's a legitimate constitutional claim and a policy that shouldn't exist for an individual to be proven. Okay. In Lucerne, it appeared that this court applied a deliberate indifference standard, right? That is correct, Your Honor. So what's your basis for saying that's the wrong standard? Our basis, with respect, Your Honor, is that Charlie Stackhouse has this tension in our jurisprudence that we can't resolve, but this case... That's correct, Your Honor. In any case, the variance does not explain why, in fact, it applies to a different standard. We believe it's a proper standard. There should have been discussion about the importance of that. Can I go back a moment to the district court's decision? Did the district court decide when addressing qualified immunity  that there should have been a policy in place and that that policy was not followed? Yes, Your Honor. Well, the district court determined that it was not reasonable to expect the defendant to have to craft certain policies. I see. Certain policies. We would think that that's not the standard by which to judge the policy. What is the standard that you speak of? It's simply whether there is adequate medical care, whether adequate medical care is supported by the reasonable individual who is determinative of adequate medical care. We could skip over the policy issue, then, and just determine whether there was adequate medical care afforded to Manasco. Whether it was a policy that provided that adequate medical care. All right. But, again, you insist on there being an actual policy in place. And you say there's a constitutional right to that? There is. As a policymaker, that's the way the state would have evaluated that proper medical care. But there is no constitutional right to have a policy on the part of medical professionals in a setting like this. I think there is, Your Honor. I think that is actually our contention. Right. That we would have a right to a policy that would afford that adequate medical care. But you cited no case to support that habit. Well, that's what we rely on J.M. Casey and Luzerne for. But Luzerne doesn't say that. Luzerne says that the assertion was that the policies in place were problematic. Luzerne wasn't a case where there were no policies, right? I believe that is correct, Your Honor. And this is not the first question. It's a secondary component to our plan to protect the policymaker's liability. And that's a failure to implement monitoring policies with regard to some of that sort of institutional safeguarding. Okay. Thank you very much, Mr. Kroger. Ms. Wood, you said you did mention Mr. McAuley who deserves some time. So, whatever time you feel is reserved is yours. Thank you, Your Honor. I have a few things. I mean, I would like to point out that in this court proceeding, in the scheme, which is Mora, that the court said that really when you look at it, there is no difference between what's written in different standards and what's not written in different standards. I mean, if you look at that voice, the only question that this court has is was judgment exercised? And here, there was. And when he was placed in there, he was assessed. He was seen by the nurse before he was placed in the room. So, there was a medical judgment made by a registered nurse about whether or not he should be placed in there, whether he had an injury, if it was related to any type of situation in which he may not work. But you're saying, and I remember the scheme well because that debate, the language that you just mentioned from Mussini was the topic of a lot of discussion on the court is exactly what that meant and what the standard was. So, you're not suggesting that once judgment is exercised, that's the end of the inquiry. What if judgment is exercised in such a way that everybody would agree that it shocks the conscience? The fact that judgment was exercised in a horrendous way does not shield somebody from immunity, does it? Well, that's why I said that way. Well, I agree, I agree. That's why I asked my question. I thought you were saying that once you, the Constitution simply requires that you exercise professional judgment. And once you exercise professional judgment, as far as the Constitution is concerned, that's the end of the inquiry. Okay. Well, you know, you shouldn't have been seen on Friday. We didn't see him on Friday. There was a judgment exercised by Alton Coley when we saw him that he should stay in, wrap arms on the earth. And the only time we didn't receive any mental health treatment is that Friday. We went to have a conservative. Alton Coley saw him, he had a seizure. He was just laid up. He was in bed, he wanted to rest. We didn't see him on Friday. Then it was the weekend. And we saw him on Monday. He was to have a treatment session with his medical staff on Tuesday. On Wednesday, not Thursday, after his regular group that he went to, he was released from that. So he did receive treatment. The fact that some of us, that we just want to say, well, he should have received treatment on Friday, Saturday, and Sunday, doesn't mean that there was no treatment given him, that there was no resident exercise that was needed. And at the most, even, we're putting the capital in, is a negligent thing. So if we're not actually... Can you help out with the issue of professional judgment and shocking the conscience? Is there a point where the exercise of professional judgment amounts to shocking the conscience? Is that the deliberate indifference sliding scale? I think that there would be. But none of these defendants, none of these main defendants, satisfied us. None of these main defendants were the actual treatment providers, actually had knowledge. What the plaintiffs are having to do is say, well, they should have known that he may have a seizure. They should have supposed that he may urinate on himself. Does he even have the right? Sometimes I do. Sometimes I don't. Should we accept the assertions of the plaintiff that he was deprived of medical treatment while there? And that the professionals were negligent or indifferent to his monitoring? Yes. Accepting the statements of the plaintiff is being true. Well, if we're getting past the disputed facts, it's a summary judgment analysis we do. Otherwise, it goes back and resolves a disputed fact. A lot of times, it's plain evidence contradicting the plaintiff's version of the facts for reference summary judgment. And what we have to do is look just at the one-side statement of the facts. What was the assessment that he got? What was the quality or the nature of it? She sat him in. She placed him on a stock. She waited until he had his seizures. He stopped. He helped him into the bed. She noted that there was no lateral bowel. There, Manasco testified that his room, his bathroom, was two doors down from the nurse's office and the nurse's office. That's 24-7. The nurse was there two doors away from Manasco at all times. The next time he had a seizure that we were aware of was, I think it was Saturday, and a different nurse, Jefferson came in while he was having a seizure. She exercised judgment in placing him on a stock, waiting until the movement stopped, and taking his Bible signs and making sure he was stable. Again, judgment was exercised. Was that the so-called pseudo-seizure? Is that the one referring to? Somebody called it that. It was a pseudo-seizure. Okay. But it was an actual seizure, a pseudo-seizure. I don't really think it had issues here. The fact of the matter is he was naked in movement. He didn't have a seizure. We can accept that he was having a seizure. The nurse exercised judgment by placing him on his stock and doing what he was doing. He has always, during Manasco, testified that he had seizures all the time. He had seizures in his room. He had a seizure in his very room. He said additional medication during the treatment session that he was able to take care of himself. When you say he had seizures all the time, I'm not sure that helps you to say that because their argument is that there was no evaluation before he was placed in there to determine whether or not he would be appropriate for that kind of a physical setting restraint if the excess sass was going to exacerbate seizures or bring on seizures. That was the quote that said he could not participate in a treatment program at all. He said, I have seizures when I'm under stress. He wasn't wired there as a stressful environment. He should be able to confront or criticize an officer and have no consequences for that and not be made to say, what did you do? How did you react to that situation? You should have changed the situation and done something differently. Do you think he could have done that? He could not do that because he has a seizure condition. There are other people in the FDA that have seizure conditions. I just cited a TB case which discussed the fact that if you have a problem with any treatment, you should go to the court to make an application for a TB, a pediatric seizure condition. That doesn't mean that there would be a separate policy where the treatment program needs to be different. There was not a trend done. There was no indication that he needed to get a post-op. Could you elaborate on the nature and extent of the monitoring that was done? Was there a policy in place that required that he be checked or looked after on a periodic basis? So that you gave some thought or at least the institution gave some thought that monitoring may be appropriate but it was determined that he did not need that. There was an instance where he banged his head against the toilet. I suppose if he had been monitored, maybe that could have been prevented. I can understand that you don't have 24-hour monitoring but was there a policy in place that periodic monitoring is appropriate, perhaps on an hourly or six-hourly basis? That area, there were two people in that area there all day long and just to deal with those people. So there was an officer there. There was also, as I said, a nurse's station two doors down. So they came in an area that was considered a medical area anyway and there were only two people there for the officer to watch. You know what that officer is supposed to do? His duties are? He monitors who's in and out. Is the inmate visible from outside? In other words, is there a glass? I understand Manesco was able to lip-read somebody who was making a statement about him. Was that through that piece of glass? Answer the following question. This is a whole separate area of inquiry. Why wouldn't that be a verbal act? How wouldn't it come into evidence as a verbal act? That's what makes it a verbal act. That's what makes it a verbal act. If someone told Panasco, then it's a statement. If no one told Panasco, why wouldn't it be a verbal act and come in that way? Okay. Okay. Well, we understand the argument. We thank both sides for a very helpful argument. Extraordinary presentation. The reason is very, very helpful. Thank you very much.